Edward F. GONZALEZ, Ana T. Gonzalez and A.T.G. Agency, Incorporated, Plaintiffs–Appellants,

v.

The HOME INSURANCE COMPANY, the Home Indemnity Company, the Home Insurance Company of Indiana and City Insurance Company, Defendants– Appellees.

No. 726, Docket 89–7856.

United States Court of Appeals, Second Circuit.

Argued Jan. 22, 1990.

Decided July 23, 1990.

Cornelia T.L. Pillard, New York City (Julius LeVonne Chambers, Charles Stephen Ralston, Ronald L. Ellis, Loren Baily, New York City, Harry C. Kaufman, Eastchester, N.Y., on brief), for plaintiffs-appellants.

Lawrence O. Kamin, New York City (Mitchel H. Ochs, Willkie Farr & Gallagher, New York City, on brief), for defendants-appellees.

Before KEARSE, MINER, and WALKER, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiffs Edward F. Gonzalez, Ana T. Gonzalez, and A.T.G. Agency, Incorporated (collectively "Gonzalez"), former insurance agents for the defendant insurance companies, appeal from a final judgment of the United States District Court for the Southern District of New York, John M. Cannella, *Judge*, dismissing their complaint alleging principally that defendants discriminated against them on the basis of their race, in violation of 42 U.S.C. § 1981 (1982). The district court granted judgment on the pleadings on the ground that the complaint sought redress for discrimination merely in the performance and termination of the contractual relationships, rather than in their creation, and hence was foreclosed by *Patterson v. McLean Credit Union*, — U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). On appeal, plaintiffs contend that the case should not have been dismissed because, *inter alia*, (1) the complaint alleged that two of the defendants entered into agreements with them that included overtly discriminatory terms, (2) their agreements with the other two defendants included covertly discriminatory terms, (3) *Patterson* does not foreclose suits for discriminatory termination of a relationship, and (4) *Patterson* should not have been applied retroactively. For the reasons below, we conclude that the complaint stated a claim on which relief can be granted against two of the defendants in the wake of *Patterson* and that plaintiffs should be allowed to file an amended complaint. Accordingly, we vacate the judgment of dismissal and remand for further proceedings.

## I. BACKGROUND

Plaintiffs Edward F. Gonzalez and his wife Ana T. Gonzalez, who are Hispanic,

are the sole stockholders in A.T.G. Agency, Incorporated. Defendants are four affiliated insurance companies: The Home Insurance Company ("Home"), The Home Indemnity Company ("Home Indemnity"), The Home Insurance Company of Indiana ("Home of Indiana"), and City Insurance Company ("City Insurance"). Gonzalez acted as an insurance agent for Home and Home Indemnity from January 1983 through November 15, 1984, and as an agent for Home of Indiana and City Insurance from October 1983 through November 15, 1984. As to the formation, performance, and termination of the agency agreements, the complaint alleged the following.

On December 28, 1982, Gonzalez entered into an agency agreement with Home and Home Indemnity (the "1982 Agreement"), whereby Gonzalez would act as a property/casualty insurance agent for those two companies. The 1982 Agreement provided that it could be terminated upon 90 days' written notice by either party. Gonzalez began working as defendants' agent in January 1983, and was assigned to defendants' field office in Yonkers, New York. The complaint alleged that Home and Home Indemnity proceeded to impose on Gonzalez conditions and restrictions that they did not impose on their white agents and otherwise to treat Gonzalez unfavorably as compared to their white agents. As specifics, the complaint alleged that these defendants, *inter alia*, promoted to their white agents a premier comprehensive coverage called "Gold Key" but refused to allow Gonzalez to sell Gold Key; that they intentionally delayed acting on policies submitted by Gonzalez, while acting expeditiously on those submitted by white agents; and that they imposed on Gonzalez requirements for minimum premium performance, while not imposing similar quotas on their white agents.

The premium quotas, along with certain other requirements, were imposed on Gonzalez by Home and Home Indemnity in or about September 1983. Those defendants informed plaintiffs at that time that Gonzalez would be required to produce $100,000 in policy premiums between September 1, 1983, and June 30, 1984; that its "$100,000 of premiums must be 70% commercial insurance and 30% personal insurance"; and that Gonzalez could not sell an automobile insurance policy unless it also sold that insured a homeowner's policy. The complaint alleged that these were conditions that were not similarly imposed by Home and Home Indemnity on their white agents.

In October 1983, plaintiffs entered into an agency agreement with Home of Indiana and City Insurance (the "1983 Agreement"). This agreement included the requirements then-recently imposed on Gonzalez by Home and Home Indemnity, which were not imposed on white agents.

The complaint further alleged that, after the September 1983 imposition of the premium quotas, Gonzalez submitted to defendants more than 300 applications for insurance policies, approximately 85% of which were for commercial policies. These policies would have generated first-year premiums in excess of $600,000. Defendants rejected all but 23 of the submitted policies; thereafter, they canceled or refused to renew 19 of the 23 policies. Gonzalez also submitted three applications for mass-marketing group insurance plans that would have generated first-year premiums in excess of $500,000. Defendants rejected all of these applications.

The premiums on the Gonzalez policies that were accepted by defendants amounted to only $12,500. On August 15, 1984, defendants gave Gonzalez 90 days' written notice that the 1982 and 1983 Agreements would be terminated, giving as the reason Gonzalez's failure to meet the $100,000 premium production goal. The agency relationships were terminated on November 15, 1984.

Plaintiffs commenced the present action in July 1985, alleging that defendants had discriminated against them because of their race in violation of 42 U.S.C. § 1981 and asserting various state-law claims. After engaging in substantial discovery, defendants moved in January 1988 for, *inter alia*, judgment on the pleadings under Fed. R.Civ.P. 12(c) or, in the alternative, for

summary judgment, dismissing the § 1981 claims.

On June 15, 1989, while defendants' motion was *sub judice*, the Supreme Court issued its decision in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (*"Patterson"*). In *Patterson*, the Court noted that § 1981 speaks of the making and enforcement of contracts, and ruled that an employer's racial harassment of an employee during the term of employment does not fall within the scope of § 1981. Defendants argued that *Patterson* required dismissal of plaintiffs' § 1981 claims.

In a Memorandum and Order dated July 28, 1989 ("Memorandum"), the district court granted defendants' motion for judgment on the pleadings, agreeing that *Patterson* barred Gonzalez's § 1981 claims:

> The allegations contained in plaintiffs' complaint do not involve either a refusal by the Home to enter into a contract with plaintiffs or the impairment of plaintiffs' ability to enforce established contract rights. Rather, all of plaintiffs' allegations relate to alleged discriminatory treatment by the Home after the formation of the contractual relationship.

Memorandum at 6. The court found that defendants' alleged conduct "simply does not involve the right to make or enforce a contract. Instead, such conduct involves 'the performance of established contractual obligations,' ... which, after *Patterson*, is not actionable under section 1981." *Id.* at 7 (quoting *Patterson*, 109 S.Ct. at 2373).

The court also held that discriminatory termination of an agreement does not involve the making or enforcement of a contract and therefore is not actionable under § 1981 after *Patterson*. Accordingly, the court granted judgment on the pleadings to defendants on the § 1981 claims, and dismissed plaintiffs' pendent state-law claims. This appeal followed.

## II. DISCUSSION

On appeal, Gonzalez argues principally that the district court should not have dismissed the complaint on the basis of *Patterson* because (1) Home of Indiana and City Insurance entered into an agency agreement with Gonzalez that included overtly discriminatory terms, (2) Home and Home Indemnity entered into an agency agreement that included covertly discriminatory terms, and (3) all four defendants refused on the basis of Gonzalez's race to enter into insurance contracts with clients solicited by Gonzalez. Plaintiffs also contend, *inter alia*, that the district court either should not have applied *Patterson* to their case retroactively or should have allowed them to amend their complaint in light of *Patterson*. We conclude that plaintiffs' first contention has merit and that they should be allowed to amend their complaint.

### A. The Patterson *Decision and the Scope of § 1981*

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981 (1982). In *Patterson*, the Supreme Court stated that this provision "cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts." *Patterson*, 109 S.Ct. at 2372. The Court held that an employer's alleged racial harassment of an employee involved neither the "mak[ing]" nor the "enforce[ment]" of a contract and therefore was not actionable under § 1981.

With respect to the statute's protection of the right to "make" contracts, the Court stated that § 1981

> extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, in-

cluding breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment....

*Id.* at 2372–73. While the Court recognized that conduct occurring after the contract's formation "may be used as evidence that a divergence in the explicit terms of particular contracts is explained by racial animus," *id.* at 2376 (footnote omitted), it stated that the critical question under § 1981 is "whether the employer, *at the time of the formation of the contract*, in fact intentionally refused to enter into a contract with the employee on racially neutral terms," *id.* at 2376–77 (emphasis in original). Further, with respect to a claim that the defendant had, for racial reasons, denied the plaintiff a promotion, the *Patterson* Court noted that where a prior contractual arrangement exists, the limitations of § 1981 cannot be circumvented merely by alleging that a contract was amended in a discriminatory fashion. To constitute an amendment that amounted to the making of a contract within the meaning of § 1981, there must have been "an opportunity for a new and distinct relation" between the parties. *Id.* at 2377.

**B.** *Gonzalez's Claims of Discriminatory Contract Formation*

■ Under *Patterson*'s view of the scope of § 1981, the district court correctly concluded that many of plaintiffs' allegations, particularly those with respect to Home and Home Indemnity, failed to state a claim. The complaint did not allege that when those two defendants entered into agreements with Gonzalez in 1982 they insisted on any terms that varied from the terms agreed to with their non-Hispanic agents. Rather, the thrust of the complaint against Home and Home Indemnity was principally that after the 1982 Agreement was entered into, those defendants instituted discriminatory quotas, imposed discriminatory restrictions as to the types of insurance to be written, and harassed

Gonzalez by delaying action on the policy applications it submitted. Though these actions were alleged to have been discriminatory, the complaint did not link them to the making of the contract rather than to post-contract-formation performance by Home and Home Indemnity. Since *Patterson* explicitly stated that "the right to make contracts does not extend, as a matter of either logic or semantics, to ... imposition of discriminatory working conditions," the district court properly ruled that these allegations did not state a claim under § 1981.

■ As to Home of Indiana and City Insurance, however, we reach a different conclusion. The complaint indicates that these companies were not parties to the 1982 Agreement; Gonzalez entered into agency agreements with them in October 1983. According to the complaint, by that time, Home and Home Indemnity had imposed many of the racially discriminatory conditions on Gonzalez, and these nonneutral terms were incorporated in the agreements between Gonzalez and Home of Indiana and City Insurance. Thus, read with the requisite liberality, *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), the complaint is sufficient to permit plaintiffs to prove that Home of Indiana and City Insurance refused to enter into agency contracts with Gonzalez except on racially discriminatory terms. Since *Patterson* recognized that § 1981 prohibits not only racially motivated refusals to enter into contracts but also offers to enter into a contract only on discriminatory terms, plaintiffs have stated claims against Home of Indiana and City Insurance that survive *Patterson*.

Home of Indiana and City Insurance seek to escape this conclusion by pointing out that Gonzalez became their agent by means of an addendum to the 1982 Agreement, which they characterize as merely "a technical amendment" to the 1982 Agreement. We are unpersuaded. Though these defendants argue that they were listed in the 1982 Agreement among the companies for which Gonzalez could write insurance, it is conceded that the 1982 Agree-

ment was not signed by Home of Indiana or City Insurance. The characterization of the addendum as purely technical is further belied by the terms of the 1983 Agreement itself, which made Home of Indiana and City Insurance parties to the 1982 Agreement "[e]ffective October 21, 1983." The addendum bears no other date. Plainly the complaint may be read as alleging that in October 1983 new relationships came into being between Gonzalez and Home of Indiana and between Gonzalez and City Insurance. Indeed, even if the parties had agreed on some retroactivity, we would be hard pressed to conclude that the contract was not formed at the time the parties entered into their agreement, regardless of what retroactive effect they agreed to give it at the time of formation.

In sum, we conclude that at least as to Home of Indiana and City Insurance, the complaint stated a claim upon which relief can be granted under § 1981 in light of *Patterson*. Accordingly, the judgment of the district court must be vacated and the matter remanded for further proceedings.

### C. *Gonzalez's Other Arguments*

Plaintiffs make a variety of other arguments in support of their complaint, some of which may merit further consideration in the district court. They contend (1) that the complaint against Home and Home Indemnity may be sustained on the ground that Home and Home Indemnity covertly imposed on them discriminatory terms in making the 1982 Agreement, (2) that *Patterson* does not foreclose a § 1981 claim for discriminatory termination of a contract, (3) that they should be allowed to pursue a § 1981 claim on the basis that the defendants refused to enter into insurance contracts with Gonzalez's clients on the basis of Gonzalez's race, and (4) that, in any event, *Patterson* should not have been applied to their complaint retroactively. Though we reject most of these contentions, we conclude that leave to replead is warranted.

#### 1. "Covertly Discriminatory Terms"

Gonzalez argues that the 1982 Agreement with Home and Home Indemni-

ty contained covertly discriminatory terms. The nature and validity of this argument are not entirely clear. If plaintiffs mean that that agreement contained some terms that differed from the terms agreed to with white agents, the discriminatory motivation for which became known only later, such a claim would be actionable under § 1981 as interpreted by *Patterson*. If plaintiffs mean instead that the 1982 Agreement with Home and Home Indemnity contained precisely the same terms as the companies' agreements with white agents but masked the companies' then-existing intent to discriminate against Gonzalez, the effect of *Patterson* is not clear.

In dissenting in part in *Patterson*, Justice Brennan expressed the view that § 1981 authorizes an action when "the acts constituting harassment [are] sufficiently severe or pervasive as effectively to belie any claim that the contract was entered into in a racially neutral manner." 109 S.Ct. at 2389 (Brennan, *J.*, dissenting in part). The *Patterson* majority disagreed with this view, stating that post-contract-formation harassment cannot be called a refusal to "make" a contract. *Id.* at 2376. Nonetheless, the majority

> agree[d] that racial harassment may be used as evidence that a divergence in the explicit terms of particular contracts is explained by racial animus. Thus, for example, if a potential employee is offered (and accepts) a contract to do a job for less money than others doing like work, evidence of racial harassment in the workplace may show that the employer, at the time of formation, was unwilling to enter into a nondiscriminatory contract. However, and this is the critical point, the question under § 1981 remains whether the employer, *at the time of the formation of the contract*, in fact intentionally refused to enter into a contract with the employee on racially neutral terms.

*Id.* at 2376–77 (emphasis in original; footnote omitted).

Though we read this passage as allowing a § 1981 claim where there is a divergence

of racially neutral terms that is explained by racial animus, it is not clear whether it was intended also to allow a § 1981 claim that, as to a contract with nondivergent terms, the employer had no intention of honoring the terms in a racially neutral manner. Given the fact that the complaint was drafted long prior to the decision in *Patterson*, the lack of certainty as to plaintiffs' proffer, and the lack of clarity in the thrust of *Patterson* itself, we conclude that plaintiffs should be given an opportunity to amend the complaint. Though defendants protest that plaintiffs did not seek leave to amend in the district court, and we note that plaintiffs did not make such a request after *Patterson* was decided, they had in fact previously requested leave to amend as an alternative to dismissal of the complaint. We conclude that, especially since the matter must be remanded for further proceedings against Home of Indiana and City Insurance, the circumstances warrant giving plaintiffs an opportunity to file an amended complaint stating, if they can, claims against the two remaining defendants under § 1981 in light of *Patterson*.

### 2. Section 1981's Applicability to Contract Termination

Gonzalez also contends that *Patterson* does not foreclose an action under § 1981 for the discriminatory termination of a contract. Prior to *Patterson*, this Court and others had viewed discriminatory contract termination as falling within the prohibition of § 1981. *See, e.g., Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989); *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 202 (1st Cir.1987); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 558 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). The *Patterson* Court, though it did not otherwise address whether discriminatory termination is within the scope of § 1981, stated that the concept of contract formation does not encompass "breach of the terms of the contract." 109 S.Ct. at 2373. In the wake of *Patterson*, courts have divided as to whether a viable claim for discriminatory termination of a contract may still be brought under § 1981. *Compare*

*Lavender v. V & B Transmissions & Auto Repair*, 897 F.2d 805, 807–08 (5th Cir.1990) (no viable claim for termination under § 1981), and *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 849 (9th Cir.1990) (same), *with Hicks v. Brown Group, Inc.*, 902 F.2d 630, 635–48 (8th Cir.1990) (*Patterson* does not foreclose § 1981 claim for termination). *See also Jett v. Dallas Independent School District*, — U.S. ——, 109 S.Ct. 2702, 2710, 105 L.Ed.2d 598 (1989) ("assuming … without deciding, that petitioner's rights under § 1981 have been violated by his removal and reassignment"); *Lytle v. Household Manufacturing, Inc.*, — U.S. ——, 110 S.Ct. 1331, 1336 n. 3, 108 L.Ed.2d 504 (1990) (instructing circuit court on remand to consider the impact of *Patterson* on § 1981 claims of discriminatory dismissal and retaliation).

 In general, we are not inclined to view the termination of a contract as involving either its "mak[ing]" or its "enforce[ment]," and to the extent that the complaint in the present case alleges a run-of-the-mine claim that the termination of plaintiffs' contracts was discriminatory, we conclude that that claim was properly dismissed in light of *Patterson*. Nonetheless, just as a person might enter into a contract while having no intention of performing it in a racially neutral manner, as discussed in Part II.C.1. above, such a person might enter the contract having the intent, at the time of formation of the contract, to terminate it for racially discriminatory reasons. If plaintiffs can in good faith allege such an intent, we believe they should be allowed to do so, as *Patterson* may well not foreclose such a claim.

Accordingly, plaintiffs are free, if they can do so consistently with Fed.R.Civ.P. 11, to include in their amended complaint a claim under § 1981 that one or more of the defendants entered into an agency agreement with them while harboring the intent to terminate the agreement because of plaintiffs' race.

### 3. Refusal to Enter Insurance Contracts with the Clients

 Plaintiffs argue, as they did in the district court, that they are entitled to sue

under § 1981 for defendants' failure to enter into insurance contracts with Gonzalez's clients on account of Gonzalez's race. We disagree. As agents, plaintiffs do not "make" the insurance contracts; they merely broker them. An agent who arranges a contract for a disclosed principal does not become a party to that contract. *See Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 860 (2d Cir.1985); *Restatement (Second) of Agency* § 320 (1958). Thus, defendants' rejections of proffered customers did not constitute a refusal to make a contract with Gonzalez.

### 4. Retroactivity of Patterson

■ Finally, plaintiffs contend that the district court should not have applied *Patterson* to their claims retroactively because (a) so much time had been spent in discovery under pre-*Patterson* law, and (b) their relationship with defendants was not that of employee-employer, and hence they cannot bring an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1982) ("Title VII"), and they have no other federal remedy available to them for discriminatory performance of the contracts. We are unpersuaded.

A federal court generally will apply the law in effect at the time it renders its decision. *See Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). The court may depart from this rule in a particular case in light of the three criteria articulated in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971):

> First, the decision to be applied nonretroactively must establish a new principle of law, [as] by overruling clear past precedent on which litigants may have relied.... Second, ... 'we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' ... Finally,

we have weighed the inequity imposed by retroactive application....

*Id.* at 106–07, 92 S.Ct. at 355–56 (quoting *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965)). However, when the Supreme Court, in announcing a new principle, itself applies it retroactively to the case at bar, generally " 'no sound reason exists for not doing so' " in a later appeal. *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239, 241 (2d Cir.) (quoting *Holzsager v. Valley Hospital*, 646 F.2d 792, 797 (2d Cir.1981)), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). Since the Supreme Court applied the principles announced in *Patterson* to the facts in that case, which had been litigated to final judgment, we are unpersuaded by plaintiffs' argument that retroactivity should be denied here on account of the large amount of time spent in discovery. *Accord Lavender v. V & B Transmissions & Auto Repair*, 897 F.2d at 806–07 (applying *Patterson* to previously-rendered district court judgment); *Carroll v. General Accident Insurance Co. of America*, 891 F.2d 1174 (5th Cir.1990) (same); *Courtney v. Canyon Television & Appliance Rental*, 899 F.2d at 849 (same).

We also reject plaintiffs' contention that *Patterson* should not be applied to their case retroactively because they have no Title VII remedy. Though the Supreme Court mentioned in *Patterson* that the plaintiff in that case did have a Title VII remedy, we do not believe the Court meant to imply that the "mak[ing] and enforce[ment]" of contracts as used in § 1981 has broader scope when the contract is for goods or services other than employment.

### CONCLUSION

For the foregoing reasons, the judgment dismissing the complaint is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.